**HODL LAW CALI, APC**
**Frederick A. Rispoli, Cal. Bar No. 321794**
**27762 Antonio Parkway**
**Suite L-1, No. 232**
**Ladera Ranch, CA 92694**
**Telephone: (213) 292-5200**
Filing@HodlLaw.org
*Attorney for Plaintiff Hodl Law, PLLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

HODL LAW, PLLC

      *Plaintiff*,

  vs.

SECURITIES AND EXCHANGE
COMMISSION

      *Defendant*.

Case No.: **'22 CV 1832 BEN JLB**

**COMPLAINT**

Civil:

1) Request For Declaratory Relief
 That The Ethereum Network
 And Ether Digital Currency
 Unit Are Not Securities Or
 Investment Contracts Under
 The Federal Securities Act Of
 1933

  Plaintiff Hodl Law, PLLC ("Hodl Law") alleges the following against the Securities and Exchange Commission (hereinafter "SEC" or "Defendant"), based on personal knowledge, the investigation of counsel, and information and belief.

**INTRODUCTION**

  1. Plaintiff, a law firm that focuses on legal and regulatory issues regarding digital assets (also known as digital currency units ("DCUs") and/or cryptocurrencies), requests declaratory relief in the face of years-long, purposeful delay and obfuscation by the Defendant regarding its jurisdictional authority with respect to this technology. For over fourteen years, the Defendant has vaguely and ambiguously asserted its "right" to

1

police digital assets as securities yet has refused to identify more than one digital asset that it believes is a security *prior to* initiating enforcement actions.

2.      This intentional, weaponized ambiguity as to why the Defendant provides no guidance or rules regarding its view of DCUs is perhaps best summarized by its then-Senior Adviser for Digital Assets and Innovation, Valerie Szczepanik. When asked at a public event whether she believed the Defendant's lack of earnest guidance on DCUs was sufficient, Ms. Szczepanik responded: "I think if you were to start down road of being very prescriptive and putting out specific releases about hypothetical situations, not only would you probably waste a lot of time but you would probably create a road map to get around it."

3.      This deliberate approach by the Defendant has unsurprisingly bestowed upon itself maximum prosecutorial discretion over an asset class for which it has no jurisdiction from Congress. Recent email disclosures by the Defendant—compelled by two federal district court judges over Defendants' multiple objections—suggest the Defendant's entire strategy is to be deliberately "confusing" in order to maintain maximum flexibility to prosecute at will (and without fair notice).

4.      Yet the danger to Plaintiff is very serious and imminent. For example, as recently as July 21, 2022, the Defendant filed a civil complaint against three individual employees at cryptocurrency exchange Coinbase Global, Inc. ("Coinbase"), alleging the defendants engaged in "insider trading in certain crypto asset securities" while working at Coinbase.[1] The Defendant alleged those "unregistered securities" were the DCUs known as AMP, RLY, XYT, RGT, LCX, POWR, DFX, and KROM.[2]

---

[1] *See SEC v. Wahi, et. al.*, Case No. 22-CV-01009 (W.D. Wash. July 21, 2022) at ¶ 1.

[2] *See id.* at ¶ 39 (AMP), ¶ 45 (RLY), ¶ 50 (DDX), ¶ 57 (XYO and RGT), ¶ 71 (LCX), ¶ 78 (POWR), and ¶ 82 (DFX and KROM).

5.      Despite the above DCUs existing and trading on the market for *one-to-five years* (depending on the specific DCU), the Defendant never once asserted to the investing public that it believed these DCUs were securities under federal law—until the Defendant launched the enforcement action.

6.      Plaintiff engages in transactional activity on the Ethereum Network, along with literally millions of other users worldwide, which requires use of the Ether DCU (at times referred to as "ETH") in order to conduct such transactions. The Defendant has refused to provide Plaintiff—and millions of other network users—any concrete guidance as to whether such activity could, at the Defendant's whim, be prosecuted as engaging in the sale of unregistered securities.

7.      To color the magnitude of Defendant's egregious conduct, the current market capitalization of the Ethereum Network is measured in the hundreds of billions of dollars.

8.      Consequently, Plaintiff seeks a declaratory ruling from the Court that engaging in transactional activities on the Ethereum Network using the Ether DCU does not implicate the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* (herein the "Securities Act").

9.      Ultimately, the economic reality of blockchain networks and DCUs simply does not provide the Defendant with a roving commission to regulate *every* outlay of funds that the SEC claims may benefit from the registration and disclosure requirements of securities laws.

## NATURE OF PROCEEDING
## JURISDICTION AND VENUE
## RELIEF SOUGHT

10.     Plaintiff brings this action pursuant to the authority conferred upon it pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and Fed. R. Civ. P. 57.

11.     Plaintiff further seeks the necessary and proper relief of attorney fees pursuant to 28 U.S.C. § 2202 as Defendant has willfully and callously failed to confirm or deny its intent to assert jurisdiction over the Ethereum Network and ETH for *eight years* and despite hundreds of requests from everyday users the Defendant only exists *solely* in order to purportedly "protect."

12.     The federal Securities Act defines what are—and what are not—securities.

13.     The law vests Defendant with narrowly tailored jurisdiction to regulate the securities markets and to bring actions for violations of the federal securities laws. This action represents a federal question and thus this district has jurisdiction pursuant to 28 U.S.C. § 1331.

14.     This Court also has jurisdiction over this action pursuant to the Securities Act, 15 U.S.C. §§ 77v and 78aa.

15.     Venue is proper in this judicial district pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a); the Securities Act, 15 U.S.C. § 77v(a), as the Defendant transacts business in the district; and pursuant to 28 U.S.C. § 1391 as the Defendant, a federal agency, is subject to the court's personal jurisdiction.

16.     Plaintiff seeks a final judgment permanently enjoining Defendant from asserting any of its limited jurisdiction under the Securities Act as it pertains to the Ethereum Network and its native DCU, Ether, as ETH is not, never was, and cannot be considered a "security" or "investment contract."

## THE PARTIES

17.     Plaintiff Hodl Law is an Arizona professional limited liability company that engages in the practice of law with respect to digital assets and cryptocurrencies. Such practice involves utilizing digital assets and cryptocurrencies.

18.     Hodl Law transacts on the Ethereum Network and utilizes the Ether DCU for a variety of use cases.

4

19.    Defendant is a federal government agency that has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of its attempts to act outside its limited, federal jurisdiction throughout the United States with respect to DCUs, including this district. The scheme has been directed at, and has had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including this district.

20.    Upon information and belief, the Defendant, itself or through its agents and/or independent contractors, transacts on the Ethereum Network and utilizes the Ether DCU for a variety of purposes.

21.    Upon information and belief, the Defendant has permitted its employees to buy and sell Ether DCUs without restriction since the network's launch through the present.

## SUBSTANTIVE ALLEGATIONS

## I.    DIGITAL ASSETS AND THE ETHEREUM NETWORK.

### A.    The Blockchain Network And Its Origins.

22.    This case concerns cryptocurrencies.[3] Cryptocurrencies are digital assets that employ cryptographic mechanisms to secure transactions, control the creation of additional units, and verify transactions. The underlying framework that permits this process to function is called "the blockchain."

23.    Before blockchain technology, the primary obstacle preventing the creation of cryptocurrencies was the "double-spend" problem. Previously, digital files were transmitted by duplication of the file itself. If one were to email or text a photo to another, the transaction resulted in the photo being duplicated—the sender and recipient both had

---

[3] "Cryptocurrencies" is the common term used in the popular culture to refer broadly to digital assets, which are "tokens" created on the blockchain and are a fundamental component that permits blockchain technology to function. Cryptocurrencies, digital assets, crytpo-assets, DCUs are all different ways to refer to the same token-blockchain concept described herein.

an exact copy. This problem stopped the ability of a digital asset to have value as there was no mechanism to prevent infinite duplication.

24.   The creation of the blockchain solved this problem in an elegant manner. The blockchain is a digital ledger that tracks the ownership and transactional history of its native cryptocurrency. Bitcoin is the native DCU of the first blockchain network. The Bitcoin blockchain thus tracks every transaction of every Bitcoin in existence. Every Bitcoin owner receives a digital address in order to take ownership of Bitcoin. The Bitcoin blockchain publicly lists every digital address and the amount of Bitcoin tied to that address. Every transaction from every address is publicly available and, for practical purposes, immutable.

25.   Consequently, because of its openness and immutability, Bitcoin provides a secure transaction mechanism to exchange value among parties. Transactions cannot be counterfeited or otherwise reversed.

26.   While Bitcoin was the first blockchain, numerous other blockchains have been created since Bitcoin. Many are now faster, more scalable, and less environmentally degrading than the Bitcoin Network. But like Bitcoin, nearly every blockchain utilizes a cryptocurrency, digital asset, DCU, *etc.* Many more such assets have also been created on top of existing blockchains. The properties, variability and capabilities of blockchains are dependent on the software coding of each one. Unlike Bitcoin, some blockchains allow the reversal of transactions. Other blockchains use different consensus mechanisms to verify transactions.

27.   Ownership of cryptocurrencies is similar to the ownership structure of bearer bonds. Unlike a bearer bond where the presumed owner is whoever holds the physical paper on which the bond is issued, the owner of a cryptocurrency is whoever holds the cryptographic keys. These keys have two components, a public and private key. The public key is the digital address that is publicly accessible and which the parties must

know in order to execute a transaction. The private key is what permits the owner to access the public address and initiate or confirm a transaction.

### B.     The Ethereum Network And Its Native Digital Currency Unit, Ether.

28.     In 2013, the concept of the Ethereum Network was publicized in a white paper by Vitalik Buterin, a Russian-born Canadian programmer that had developed an early interest in the first blockchain network, Bitcoin.

29.     As explained by Buterin, one purpose of the imagined-Ethereum Network was to move beyond Bitcoin's vision as a payment network by creating decentralized applications on the Ethereum Network.

30.     During the Bitcoin Conference in Miami in January 2014, Buterin teamed up with several other individuals to help assist him in making the Ethereum Network a reality. Ultimately, a large cohort of additional individuals would coalesce to assist in the creation of the Ethereum Network. They included Gavin Wood, Charles Hoskinson, Anthony Di Iorio, Mihai Alisie, Amir Chetrit, Jefferey Wilcke and Joseph Lubin (collectively referred to as the "Ethereum Creators").

31.     The Ethereum Creators created a Swiss company, EthSuisse, to act as the entity tasked with development of the Ethereum Network. Another Swiss company, the Ethereum Foundation, was created to also assist in the development of the Ethereum Network (EthSuisse and the Ethereum Foundation are herein included in the term "Ethereum Creators").

32.     In order to raise money for the development of the Ethereum Network, the Ethereum Creators conducted an Initial Coin Offering ("ICO") in 2014, in which public investors could purchase the Ether DCU.

33.     The official launch of the Ethereum Network occurred on July 30, 2015.

34.     From the inception of the Ethereum Network through its launch in 2015, Defendant was aware of the Ethereum project and that the Ethereum Creators sold the Ether DCU via an ICO. During this time frame, Defendant did not take any action to warn

7

any investors that creation of the Ethereum Network (aka computer software) was a security nor warned that the Ether DCU was a security.

35.    From its 2015 launch through June 14, 2018, the Ethereum Network continued to operate and develop, undergoing multiple upgrades to improve its functionality. During this same time, the Ether DCU continued to be bought, sold, traded, used and/or otherwise exchanged by hundreds of thousands of network users. In terms of transactions occurring on the Ethereum Network, they numbered in the millions.

36.    During this time, Defendant never advised any member of the investing public that using the Ethereum Network or the Ether DCU constituted engagement in unregistered securities transactions.

37.    In fact, during this same time frame the Defendant received thousands of inquiries from the public explicitly asking Defendant its position on the security status of the Ethereum Network and the Ether DCU. In response to all inquiries, Defendant refused to state its official position either way.

38.    In fact, during this same time frame the Defendant explicitly permitted its employees to buy and sell the Ether DCU without restriction. Defendant was aware that its employees were buying and selling the Ether DCU during this time period.

39.    Hodl Law did not exist during this time period. The firm had no connection and has no connection to the Ethereum Creators. Hodl Law did not participate in the Ethereum Creators' ICO.

**C.    Thousands Of DCU Projects Do Not Create Their Own Blockchain And Instead Build Upon The Ethereum Network.**

40.    Blockchain-based projects have the ability to build on top of existing blockchains by minting new digital assets that require the underlying blockchain to operate. The Ethereum Network is the most popular blockchain upon which other DCUs are developed. Using this blockchain as an example, a startup project can "airdrop" its newly-created token into the digital asset address of pre-existing users of the Ethereum Network. For example, if a project is going to airdrop 30 of its newly-created digital

assets on the Ethereum Network, individual public addresses simply receive 30 units of the new token. For example, an entire class of projects have created "ERC-20" tokens upon the Ethereum Network.

41.    Although the Defendant refuses to provide advance notice to the public regarding which ERC-20 tokens it subjectively decides are securities prior to filing an enforcement action, it has nevertheless affirmed in federal court that it believes, at minimum, at least some ERC-20 tokens are securities.[4]

## II.    HODL LAW DOES NOT HAVE ANY OF THE NECESSARY CONTACTS WITH A COMPUTER NETORK TO RENDER SOFTWARE CODE AN ISSUER OF SECURITIES UNDER THE SECURITIES ACT.

### A.    Hodl Law's Use Of The Ethereum Network And Purchase Of Ether DCUs Lack The Essential Ingredients Of Securities.

42.    Under the Securities Act, the definition of "security" is based on a defined list of specific instruments, including "any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement" or "investment contract." 15 U.S.C. § 77b(a).

43.    Of the defined set of "securities," the Defendant's only credible argument that a computer network falls within that set is if the network is held to be an "investment contract."

44.    The Securities Act does not define, however, the term "investment contract."

45.    Throughout the course of over a century of case law, the U.S. Supreme Court has held that any particular set of circumstances requires certain "essential ingredients" in order to be considered an investment contract.

46.    First, one or more contracts establish the rights and obligations of the parties.

47.    Second, investors provide capital and share in the earnings and profits of the project.

---

[4] *See SEC v. Wahi, et. al.*, Case No. 22-CV-01009 (W.D. Wash. July 21, 2022) at ¶ 20.

9

48. Third, a promotor of the project manages, controls and operates the project for the benefit of investors and provides a return on their investments based on their respective shares.

49. From the last *eight years* through the present, the Defendant has refused to state whether the Ethereum Network and its native Ether DCU are "investment contracts" and therefore securities under the Securities Act. The Defendant has refused to make any official statement as to whether the offer and sale of the Ether DCUs constitute an offer and sale of a "security" that require registration with the Defendant under the Securities Act.

50. At the same time, the SEC coyly implies that every transfer of (or offer to transfer) the intangible asset ETH since 2014 through the present (whether by Hodl Law, the Ethereum Creators, the original issuers of Ether DCUs, retail purchasers, or anyone else) was the offer and sale of a regulated "investment contract."[5]

51. Hodl Law transacts on the Ethereum Network and has acquired Ether DCUs.

52. Hodl Law acquired Ether DCUs through popular U.S. cryptocurrency exchanges like Coinbase and Payward, Inc. dba Kraken ("Kraken").

53. Both Coinbase and Kraken have publicly stated neither company believes the Ethereum Network and Ether DCU are securities under the Securities Act.

54. The Defendant is fully cognizant that both Coinbase and Kraken utilize the Ethereum Network and offer Ether DCUs for sale to the American public. It would follow, therefore, that Defendant has likely *privately* communicated its subjective belief that the Ethereum Network and Ether DCU are not securities.

---

[5] *See, e.g.*, *SEC v. Balina*, Case No. 1:22-CV-950 (W.D. Tex. Sept. 19, 2022) at ¶ 69 (Defendant apparently claiming the Ethereum Network is a security because "ETH contributions were validated by a network of notes on the Ethereum [Network], which are clustered more densely in the United States than in any other country").

10

55.     Hodl Law has zero connection to the Ethereum Creators and original issuers of Ether DCUs.

56.     Hodl Law neither purchased nor acquired Ether DCUs from the Ethereum Creators or the original issuers of Ether DCUs.

57.     Hodl Law did not execute any written contracts with the Ethereum Creators, the original issuers of Ether DCUs, or the computer network itself when the firm acquired ETH or transacted on the Ethereum Network. The initial 2014 distribution of Ether DCUs took place without any contract between Hodl Law and any of the Ethereum Creators and/or original issuers of Ether DCUs.

58.     Hodl Law has zero expectations, rights or benefits to any post-sale obligations from the Ethereum Creators and/or original issuers of the Ether DCUs. Therefore there can be no "investment contract" without post-sale obligations by these promoters to the purchaser, Hodl Law.

59.     Hodl Law has no rights to receive any profits from the Ethereum Creators and/or original issuers of the Ether DCUs.

60.     The Defendant has the burden to show that each specific acquisition and use of Ether DCUs by Hodl Law is an investment contract.

61.     The Defendant has the burden to show that each transaction on the Ethereum Network by Hodl Law is an investment contract.

62.     The Defendant cannot show any contractual provision requiring the Ethereum Creators and/or original issuers of Ether DCUs—directly or indirectly—to take post-sale actions to create profits for, share profits with, or return value to Hodl Law as an Ethereum Network user and/or owner of Ether DCUs.

63.     The Defendant concedes that Hodl Law's use of the Ethereum Network, based solely on Hodl Law's status as a user of the network, does *not* have the right to receive any dividends from the Ethereum Creators and/or original issuers of Ether DCUs.

64.     The Defendant concedes that Hodl Law's ownership of Ether DCUs, based solely on Hodl Law's status as an owner of ETH, does *not* have the right to receive any dividends from the Ethereum Creators and/or original issuers of Ether DCUs.

### III.   DEFENDANT HAS ENGAGED IN PURPOSEFUL, WEAPONIZED AMBIGUITY IN FLAGRANTLY ACTING OUTSIDE ITS JURISDCITION AND VIOLATING ITS STATUTORY MANDATE.

65.     Defendant has refused to provide public guidance on its subjective belief regarding the classification status of the Ethereum Network and Ether DCU despite thousands of requests from the American public.

66.     As stated above, the Ether DCU was originally created and then sold to investors in an ICO. Since its ICO the Ether DCU has been bought, sold and otherwise utilized throughout millions of transactions over eight years. During these past eight years, despite Defendant's notice and knowledge of all of the above, the Defendant never promulgated one regulation, rule or even an official statement that the Ethereum Network or the Ether DCU were (in Defendant's eyes) securities under the Securities Act.

67.     Yet, at the same, Defendant has engaged in purposeful, public ambiguity to maximize its "flexibility" to assert jurisdiction if its whims changed. As one of many examples, on June 6, 2018, then-SEC Chairman Walter Joseph "Jay" Clayton, III ("Clayton") sat for an interview on CNBC with Bob Pisani to discuss cryptocurrency and the SEC's involvement in the space. When Mr. Pisani described the general process of a cryptocurrency ICO, Clayton responded: "That is a security and [the SEC] regulate[s] that." Mr. Pisani persisted: "You're saying the way [the SEC looks] at most ICOs, they are securities?" Clayton answered: "Correct." Logically, Mr. Pisani followed up by asking Clayton if the second largest DCU by market cap, Ether, was a security: "There are other altcoins out there. There's Ether, for example . . . Is Ether a security?" Clayton responded cryptically: "Bob, I'm not going to comment on specific crypto assets, whether

they are or are not a security."[6] Not exactly inspiring, clear guidance for the public from Defendant.

68.     Clayton finished his regulatory career as SEC Chairman having never informed the American public whether the SEC considered the Ethereum Network or the Ether DCU to be a security under the Securities Act—despite being directly asked numerous times.[7]

69.     In 2018, while he was a then-professor at the Massachusetts Institute of Technology ("MIT") teaching a course titled "Blockchain and Money," current SEC Commissioner Gary G. Gensler ("Gensler") consistently stated his personal opinion was that the Ethereum Network and Ether DCU should be regulated as securities under the Securities Act.[8]

70.     During his entire stint as the current SEC Commissioner, Gensler has never informed the American public whether Defendant considers the Ethereum Network or the Ether DCU to be securities under the Securities Act.

71.     In fact, although Gensler has been asked dozens of times as to whether the Defendant believes the Ethereum Network and Ether DCU are securities—by Congress, financial reporters, and financial institutions—he has responded exactly like his predecessor.

72.     Gensler has, however, *hinted* that he believes the Ethereum Network and Ether DCU are securities under the Securities Act.

---

[6] This video interview is publicly available at https://www.youtube.com/watch?v=8YtZJRUak8E.

[7] Coincidentally, Clayton would leave the SEC in December 2020 to ultimately work part-time at a financial services firm that focuses on Ether DCU investments.

[8] *See, e.g.*, MIT OpenCourseWare, "Primary Markets, ICOs & Venture Capital, Part 2," Gensler, G., publicly available at https://www.youtube.com/watch?v=7EXcHqLg7BI&list=PLUl4u3cNGP63UUkfL0onkxF6MYgVa04Fn&index=19 (beginning at 40:12) (Gensler announcing "Ethereum, when it was first promoted in 2014, I believe passed this test. And the word 'passed' means that you are a security").

13

73.     At the same time, Gensler has never clarified whether his public musings on the security status of the Ethereum Network and Ether DCU are his personal opinion or the opinion of the Defendant.

74.     At the same time, through its agents and officers, Defendant has previously made many public comments that the Ethereum Network and Ether DCU are neither securities nor investment contracts.

75.     Prior to Gensler taking over from Clayton as SEC Chair, and while Clayton was Chair, Clayton hired William H. Hinman ("Hinman") to serve as Defendant's Director of the Division of Corporate Finance.

76.     Hinman joined the Defendant in May 2017, leaving a globally recognized law firm where, prior to his departure for the Defendant, he became intricately aware of the value of cryptocurrency, blockchain technology, and the immense wealth one could accumulate with well-timed investments in both.

77.     Within this context, Hinman agreed to attend a public, televised financial conference in his capacity as Director of the Division of Corporate Finance. The June 14, 2018 conference was named, "Yahoo! Finance All Markets Summit: Crypto."

78.     Hinman agreed to attend the conference, in part, because he intended to provide a seminal speech on the Defendant's position with respect to digital assets.

79.     As Hinman took the stage at the conference, behind him emblazoned in large font was an electronic display that read "DIRECTOR OF THE DIVISION OF CORPORATE FINANCE, SECURITIES AND EXCHANGE COMMISSION."

80.     Hinman was not invited to speak on behalf of himself; rather, he was invited to speak in his capacity as the Defendant's Director of the Division of Corporate Finance.

81.     Hinman titled his speech, "Digital Asset Transactions: When Howey Met Gary (Plastic)." This speech is publicly available on the Defendant's government website.

14

82.    In the speech, Hinman went into great detail about how the Defendant would evaluate digital asset projects and digital currency units and whether these were securities under the Exchange Act.

83.    Hinman enumerated several factors that the Defendant would analyze in determining whether a digital asset project was sufficiently "decentralized" such that the Defendant would not consider it a security under the Securities Act.

84.    These factors include:[9]

a.   Is there a person or group that has sponsored or promoted the creation and sale of the digital asset, the efforts of whom paly a significant role in the development and maintenance of the asset and its potential increase in value?

b.   Has this person or group retained a stake or other interest in the digital asset such that it would be motivated to expend efforts to cause an increase in value in the digital asset? Would purchasers reasonably believe such efforts will be undertaken and may result in a return on their investment in the digital asset?

c.   Has the promoter raised an amount of funds in excess of what may be needed to establish a functional network, and, if so, has it indicated how those funds may be used to support the value of the tokens or to increase the value of the enterprise? Does the promoter continue to expend funds from proceeds or operations to enhance the functionality and/or value of the system within which the tokens operate?

d.   Are purchasers "investing," that is, seeking a return? In that regard, is the instrument marketed and sold to the general public instead of to potential users of the network for a price that reasonably correlates with the market value of the good or service in the network?

---

[9] *See* Hinman, William. "Digital Asset Transactions: When Howey Met Gary (Plastic)." SEC (6/14/18), *available at* https://www.sec.gov/news/speech/speech-hinman-061418.

15

e.  Does the application of the Securities Act protections make sense? Is there a person or entity others are relying on that plays a key role in the profit-making of the enterprise such that disclosure of their activities and plans would be important to investors? Do informational asymmetries exist between the promoters and potential purchasers/investors in the digital asset?

f.  Do persons or entities other than the promoter exercise governance rights or meaningful influence?

g.  Is token creation commensurate with meeting the needs of users or, rather, with feeding speculation?

h.  Are independent actors setting the price or is the promoter supporting the secondary market for the asset or otherwise influencing trading?

i.  Is it clear that the primary motivation for purchasing the digital asset is for personal use or consumption, as compared to investment? Have purchasers made representations as to their consumptive, as opposed to their investment, intent? Are the tokens available in increments that correlate with a consumptive versus investment intent?

j.  Are the tokens distributed in ways to meet users' needs? For example, can the tokens be held or transferred only in amounts that correspond to a purchaser's expected use? Are there built-in incentives that compel using the tokens promptly on the network, such as having the tokens degrade in value over time, or can the tokens be held for extended periods for investment?

k.  Is the asset marketed and distributed to potential users or the general public?

l.  Are the assets dispersed across a diverse user base or concentrated in the hands of a few that can exert influence over the application?

m. Is the application fully functioning or in the early stages of development?

16

85.   Hinman also stated in his speech that "it is clear I believe a token once offered in a security offering can, depending on the circumstances, later be offered in a non-securities transaction."

86.   During his speech as Defendant's Director of the Division of Corporate Finance, Hinman announced that "based on my understanding of the present state of Ether, the Ethereum [N]etwork and its decentralized structure, **current offers and sales of Ether are not securities transactions**." [emphasis added] "And, as with Bitcoin, applying the disclosure regime of the federal securities laws to current transactions in Ether would seem to add little value."

87.   Though expansive and cleverly titled, Hinman did not come up with the speech's name or its contents on his own—despite making the claim at the outset that his speech was his personal opinion.

88.   Hinman did not disclose during his speech that it was the product of dozens of drafts, consultations and revisions with multiple staff within multiple offices and divisions of the Defendant.

89.   Hinman did not disclose that his speech was part of Defendant's strategy of deliberate subterfuge to further confuse the public on the status of the Ethereum Network and Ether DCU.

90.   Hinman's speech was circulated and reviewed among the following positions at Defendant during the relevant time: (1) Special Counsel, Office of Small Business Policy; (2) Chief Counsel, Division of Corporate Finance; (3) Assistant Chief Counsel, Division of Trading and Markets; (4) Associate Director, Division of Corporate Finance; (5) Director, Division of Trading and Markets; (6) Chief Counsel, Division of Trading and Markets; (7) Deputy Director and Senior Policy Advisor, Division of Trading and Markets; (8) Fintech and Crypto Specialist, FinHub; (9) Chief of Staff; (10) Deputy Chief of Staff; (11) Senior Advisor to Clayton; (12) Director, Division Of Investment Management; (13) Co-Director, Division of Enforcement; (14) Co-Director,

Division of Enforcement; (15) Senior Counsel, Division of Enforcement; (16) SEC General Counsel; (17) Assistant General Counsel; (18) Associate Director, Disclosure Review and Accounting Office; and (19) Deputy Chief Counsel, among others.

91.    The day following his momentous, market-moving speech, on June 15, 2018, Hinman made the rounds on financial television shows to affirm that his speech given yesterday was official guidance from Defendant. For example, during an interview with CNBC's Bob Pisani—where the emblazoned chyron read "SEC: BITCOIN AND ETHER ARE NOT SECURITIES" during the conversation—Mr. Pisani asked Hinman "You said in your speech neither Bitcoin nor Ether would be considered securities and thus not under the purview of the SEC, can you fully explain what your reasoning is?" Mr. Hinman responded, on behalf of the SEC, "When **we look at Ether** and the highly decentralized nature of the networks **we** don't see a third party promoter where applying the disclosure regime would make a lot of sense. So **we're comfortable** . . . viewing these as items that **don't have to be regulated as securities**." [emphasis added][10]

92.    In another, ongoing federal case in the Southern District of New York involving Defendant, Defendant affirmed to two federal judges that Hinman's speech was the official position of Defendant regarding the Ethereum Network and Ether DCU: "**The Speech itself**—and the many drafts and comments by [Defendant] staff across different SEC divisions and offices deliberating the agency's approach to the regulation of digital assets—**show that Director Hinman and other SEC staff used the Speech to provided public guidance** as to how Corp[orate] Fin[ance] would apply the federal securities laws to offers and sales of digital assets **including Ether**." [emphasis added][11]

---

[10] This interview can be publicly viewed at https://www.youtube.com/watch?v=CF-_0LeL8pk.

[11] *See Securities and Exchange Commission v. Ripple Labs, Inc., et al.*, Case No. 20-CV-10832 (S.D.N.Y. Feb. 17, 2022), ECF 429 at 1-2.

93.   In the same litigation months later, Defendant reaffirmed that Hinman's speech "*did* reflect Director Hinman's personal views as the Director of Corp[orate] Fin[ance] *and*, consequently, the view of the division he led." [emphasis in original][12]

94.   The emails containing Hinman's and the Defendant's comments to his speech were apparently so damaging to Defendant's credibility that, in satellite litigation, the Defendant fought for 18 months to prevent disclosing them. Two federal district court judges ordered that the emails be disclosed.

95.   One of the federal judges held that, in the course of the Defendant's obfuscation of its purported public service duties, the Defendant engaged in conduct that was "hypocrisy . . . suggest[ing] that the SEC is adopting its litigation positions to further its desired goal, and not out of faithful allegiance to the law."[13]

## IV.   PLAINTIFF—ALONG WITH MILLIONS OF OTHER INDIVIDUALS AND BUSINESSES—IS SUBJECT TO IMMINENT HARM SUCH AS SUBSTANTIAL FINANCIAL AND CRIMINAL RISK BASED ON DEFENDANT'S ABJECT FAILURE TO ENGAGE IN GOOD FAITH COMMUNICATIONS WITH THE INVESTING PUBLIC THAT IT ALLEGEDY EXISTS TO "PROTECT."

96.   Hinman, on behalf of Defendant, provided public guidance that Defendant did not view the Ethereum Network and Ether DCU as securities or investment contracts.

97.   At the same time, Hinman did not disclose that he had a significant financial interest in declaring on behalf of Defendant that the Ethereum Network and Ether DCU were not securities or investment contracts.

98.   Ex-Chairman Clayton refused on multiple occasions—when directly asked—to state whether Defendant believed the Ethereum Network or Ether DCU are securities or investments contracts.

99.   At the same time, Clayton did publicly adopt Hinman's speech at subsequent public events that Hinman's speech provided Defendant's guidance to the public.

---

[12] *See id.* at ECF No. 600 at 3.
[13] *See id.* at ECF No. 531 at 6.

100.   Like his predecessor, current Chairman Gensler has not publicly disclosed whether Defendant considers the Ethereum Network and Ether DCU to be securities or investment contracts—despite being directly asked numerous times.

101.   Defendant has filed multiple civil actions against multiple defendants, alleging unlawful securities transactions stemming from DCUs used on the Ethereum Network.

102.   Plaintiff utilizes DCUs on the Ethereum Network.

103.   Plaintiff utilizes the Ether DCU.

104.   Plaintiff utilizes the Ethereum Network.

105.   Defendant has purposefully refused to respond to Plaintiff's inquiries regarding Defendant's position on the security status of the Ethereum Network and Ether DCU.

106.   Defendant has simultaneously refused to provide Plaintiff with assurances that it will not prosecute Plaintiff for its use of the Ethereum Network and Ether DCU.

107.   Purposefully left with Defendant's deliberate, weaponized ambiguity, Plaintiff must seek declaratory relief from this Court as to whether Plaintiff's use of the Ethereum Network and Ether DCUs are lawful.

## CLAIM FOR RELIEF

## FIRST CAUSE OF ACTION

### For Declaratory Relief Pursuant To The

### Declaratory Judgment Act

Plaintiff hereby incorporates by reference all the allegations contained in this Complaint as if the same were fully set forth.

108.   Plaintiff has reviewed the myriad, conflicting public statements of Defendant regarding the security status of the Ethereum Network and Ether DCU.

109.   The security status of the Ethereum Network and Ether DCU center on the Securities Act and is thus a federal question of law.

110.   Defendant has refused to provide Plaintiff—or any person or entity—with a public response as to whether use of the Ethereum Network and Ether DCU constitute unlawful securities transactions under the Securities Act—for over *eight years*.

111.   Without any prior notice, Defendant has initiated lawsuits against numerous individuals and entities for damages stemming from Defendant's allegations that DCUs are securities or investment contracts.

112.   Plaintiff therefore is subject to imminent harm and has no alternative but to seek the intervention of this Court and request the Court grant the relief sought in this matter as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court enter a declaratory judgment against Defendant based upon the circumstances set forth above, including:

- A judgment that the Ethereum Network is not a security or investment contract under the Securities Act;
- A judgment that the Ether DCU is not a security or investment contract under the Securities Act;
- A judgment that transactional activity on the Ethereum Network does not constitute sales and offers of securities requiring registration under the Securities Act;
- A judgment that speculative offers and sales of the Ether DCU are not securities under the Securities Act;
- A judgment awarding Plaintiff all appropriate damages in an amount to be determined;
- A judgment awarding equitable, injunctive, and/or declaratory relief as may be appropriate including, but not limited to, rescission, restitution, and disgorgement;

21

- A judgment awarding Plaintiff costs and fees, including attorneys' fees, as permitted by 28 U.S.C. § 2202; and
- Grant such other legal, equitable or further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests a jury trial for all applicable issues in this action.


Dated this 21st day of November, 2022.

                                    **HODL LAW CALI, APC**

                    By:    _/s/ Frederick A. Rispoli_____
                           Frederick A. Rispoli
                           27762 Antonio Parkway
                           Suite L-1, No. 232
                           Tel: 213-292-5200
                           Filing@HodlLaw.org
                           *Attorney for Plaintiff Hodl Law, PLLC*