Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

———————————————————————

PEOPLE OF THE STATE OF NEW YORK,
by LETITIA JAMES, Attorney General of
the State of New York,

       Petitioner,

              - against -                Index No.

MEK GLOBAL LIMITED, and,
PHOENIXFIN PTE LTD
d/b/a KUCOIN

       Respondents.

———————————————————————

**PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF THE VERIFIED PETITION**

LETITIA JAMES
Attorney General of the State of New York 28
Liberty Street
New York, NY 10005

*Of Counsel*:

JOHN RUTH
Assistant Attorney General

KENNETH J. HAIM
Deputy Chief, Investor Protection
Bureau

SHAMISO MASWOSWE
Chief, Investor Protection Bureau

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................. iii

PRELIMINARY STATEMENT ......................................................................................................... 1

STATEMENT OF FACTS ................................................................................................................... 3

    I.      The KuCoin Platform ................................................................................................... 3

    II.    KuCoin Sold and Purchased Commodities and Securities Without Registration ........................... 4

        A.      ETH ...................................................................................................................... 4

              1.      The Initial Coin Offering........................................................................... 5

              2.      Transition to Staking ................................................................................. 5

              3.      ETH Is Promoted as an Investment ......................................................... 6

        B.      LUNA and UST ................................................................................................. 7

              1.      LUNA and UST Were Promoted as Investments ................................... 7

              2.      Terraform Labs Drove the Growth of LUNA and UST and Stood to Profit from that Growth ................................................................................ 8

        C.      KuCoin Repeatedly Offered, Purchased, and Sold ETH, LUNA, and UST ...................... 9

    III.   KuCoin Issued and Sold the "KuCoin Earn" Securities................................................ 9

    IV.   KuCoin Represented Itself as an Exchange................................................................. 10

ARGUMENT ...................................................................................................................................... 12

    I.      Executive Law § 63(12) Authorizes the Attorney General to Obtain Expedited, Comprehensive Relief .................................................................................................... 12

    II.    KuCoin Violated the Martin Act By Failing to Register................................................ 12

        A.      KuCoin Violated the Martin Act By Failing to Register as a Commodity Broker-Dealer 13

              1.      KuCoin Engaged in Business as a Commodity Broker-Dealer in New York ...... 14

              2.      KuCoin was not Registered as a Commodity Broker-Dealer............................ 16

        B.      KuCoin Violated the Martin Act by Failing to Register as a Securities Broker or Dealer 16

              1.      KuCoin Engaged in the Business of Effecting Transactions in Securities and Issued its Own Securities Under the *Waldstein* Test............................ 17

              2.      KuCoin Engaged in the Business of Effecting Transactions in Securities Under the *Howey* Test by Selling the Tokens ............................................... 18

              3.      The *Howey* Test is Applicable to the Tokens as Illustrated by Recent Federal Authority ..................................................................................... 20

              4.      KuCoin Issued and Sold its Own Securities Under the *Howey* Test ................... 21

              5.      KuCoin was not a Registered Securities Broker or Dealer ................................. 22

    III.   Respondents Violated the Exchange Provision of the Martin Act ................................... 22

    IV.   KuCoin's Failure to Comply with OAG Subpoena is Prima Facie Proof of its Violations of the Martin Act ................................................................................................................ 23

    V.    KuCoin Engaged in Persistent Illegality in Violation of Executive Law § 63(12).................... 23

    VI.   The Court Should Order a Permanent Injunction, an Accounting, and Direct KuCoin to Prevent

Access to its Website and Mobile App to New Yorkers and Award Restitution, Disgorgement, and Costs .............................................................................................................25

A.      The Court Should Order Permanent Injunctive Relief .......................................25

B.      The Court Should Order Respondent to Provide an Accounting of All Fees Received From New York Investors and Direct KuCoin to Prevent Access to its Website, Mobile App, and Services from the State of New York ................................................26

C.      The Court Should Order KuCoin to Pay Restitution and Disgorgement .........................27

VII.    The Court Should Award OAG Costs .......................................................................28

CONCLUSION .........................................................................................................28

# TABLE OF AUTHORITIES

*CASES*                                                                          *PAGE(S)*

*All Seasons Resorts Inc. v. Abrams*,
   68 NY 2d 81 (1986) ...................................................................................... 17

*CFTC v. Gelfman Blueprint, Inc.*,
   2018 U.S. Dist. LEXIS 207379 (S.D.N.Y. Oct. 2, 2018) ........................................14

*CFTC v. McDonnell*,
   287 F. Supp. 3d 213 (E.D.N.Y. 2018)................................................................. 13

*Freedom Disc. Corp. v. Korn*,
   28 A.D. 2d 517 (1st Dep't 1967)....................................................................... 24

*In re Waldstein*,
   160 Misc. 763 (Sup. Ct. Albany Cnty. 1936)...............................................17-19

*In the Matter of Coinflip, Inc.*,
   2015 CFTC LEXIS 20, 2015 WL 5535736 (Sep.17, 2015)................................... 14

*Lagemann v. Spence*,
   2020 U.S. Dist. LEXIS 88066 (S.D.N.Y. May 18, 2020)......................................13

*Matter of James v. iFinex Inc.*,
   185 A.D. 3d 22 (1st Dep't 2020)....................................................................... 13

*New York v. Maiorano*,
   189 A.D.2d 766 (2d Dep't 1993) ...................................................................... 27

*People v. 21st Century Leisure Spa, Int'l*,
   153 Misc. 2d 938 (Sup. Ct. N.Y. Cnty. 1991).............................................. 24, 27

*People v. Allen*,
   2021 WL 394821 (Sup. Ct. N.Y. Cnty. Feb. 4, 2021)........................................ 24

*People v. Allen*,
   198 A.D. 3d 531 (1st Dep't 2021) ..................................................................... 24

*People v. Apple Health and Sports Clubs, Ltd.*,
   206 A.D.2d 266 (1st Dep't 1994)...................................................................... 12

*People v. Applied Card Sys., Inc.*,
   27 A.D.3d 104 (3d Dep't 2005) ....................................................................... 12

*People v. Applied Card Sys.*, Inc.
   11 N.Y.3d 105 (2008) .......................................................................................27

*People v. B.C. Assocs.*,
    194 N.Y.S.2d 353 (Sup. Ct. N.Y. Cnty. 1959)...................................................................12

*People v. Coinseed, Inc.*,
    2021 WL 4148794 (Sup.Ct. N.Y. Cnty. 2021) ...........................................13, 26, 27

*People v. Credit Suisse Sec. (USA) LLC*,
    31 N.Y.3d 622 (2018) .......................................................................................13

*People v. Dell, Inc.*,
    21 Misc. 3d 1110 (Sup. Ct. Albany Cnty. 2008)...............................................25

*People v. Empyre Inground Pools, Inc.*,
    227 A.D.2d 731 (3d Dep't 1996) ...............................................................23,24, 26

*People v. Ernst & Young, LLP*,
    114 A.D.3d 569 (1st Dep't 2014).................................................................27

*People v. Federated Radio Corp.*,
    244 N.Y. 33 (1926) .......................................................................................1

*People v. First Meridian Planning Corp.*,
    86 N.Y. 2d 608 (1995) .................................................................................18

*People v. Greenberg*,
    27 N.Y.3d 490 (2016) .............................................................................. 25, 27

*People v. Landes*,
    84 N.Y.2d 655 (1994) ................................................................................ 1, 13

*People v. P.U. Travel, Inc.*,
    2003 N.Y. Misc. LEXIS 2010 (Sup. Ct. N.Y. Cnty. June 19, 2003) .....................12

*People v. Sec. Elite Grp., Inc.*,
    2019 N.Y. Misc. LEXIS 5556, 2019 NY Slip Op 33068(U) .................................26

*People v. Therapeutic Hypnosis*,
    83 Misc. 2d 1068 (Sup. Ct. Albany Cnty. 1975).................................................28

*People v. Thomas*,
    134 Misc.2d 649 (Sup. Ct. N.Y. Cnty. 1986).....................................................17

*People v. Veleanu*,
    89 A.D.3d 950 (2d Dep't 2011) ..................................................................26

*People v. World Interactive Gaming Corp.*,
    185 Misc. 2d 852, 714 N.Y.S.2d 844 (Sup. Ct. N.Y. Cnty. 1999)...........................24

*Sec. Exch. Comm'n v. LBRY Inc.*,
    2022 U.S. Dist. LEXIS 202738 (D.N.H. Nov. 7, 2022)...................................................20, 21

*Sec. Exch. Comm'n v. Telegram Grp. Inc.*,
    2020 U.S. Dist. LEXIS 53846 (S.D.N.Y. Mar. 24, 2020).......................................................... 14

*Sec. Exch. Comm'n. v. W.J. Howey Co.*,
    328 U.S. 293 (1946) ............................................................................................... 18-21

*State v. Daro Chartours, Inc.*,
    72 A.D.2d 872 (2d Dep't 1979) ................................................................................... 25, 27

*State v. Ford Motor Co.*,
    74 N.Y.2d 495 (1989) .................................................................................................... 25

*State v. Ford Motor Co.*,
    136 A.D.2d 154 (3rd Dep't 1988) ................................................................................... 27

*State v. Midland Equities of N.Y., Inc.*,
    117 Misc.2d 203 (Sup. Ct. N.Y. Cnty. 1982)...................................................................... 27

*State v. Princess Prestige*,
    42 N.Y.2d 104 (1977) ................................................................................................23-27

## STATE STATUTES

13 NYCRR § 13.2 .......................................................................................................... 16

## CPLR

Article 4................................................................................................................... 3

§ 409.......................................................................................................................... 12

§ 410.......................................................................................................................... 12

§ 8303(a)(6)............................................................................................................... 28

## GENERAL BUSINESS LAW

§ 352 ................................................................................................................. passim

§ 353.........................................................................................................................23

§ 359 ................................................................................................................. passim

***EXECUTIVE LAW***

§ 63(12) ............................................................................................................ passim

## *MISCELLANEOUS AUTHORITIES*

Amended Memorandum for Governor by Attorney General Abrams (July 10, 1984)...................2

David D. Siegel, *N.Y. Practice § 547* (6th ed. 2018) ...................................................12

Governor Nelson A. Rockefeller on Registration of Securities Brokers, Dealers, and Salesmen, (April 22, 1959)...................................................................................2

Letter from Attorney General Albert Ottinger to Governor Alfred E. Smith, (Apr. 1, 1925) ........................................................................................................ 2

Petitioner, People of the State of New York by Letitia James, Attorney General of the State of New York (the "OAG"), submits this Memorandum of Law in support of the Verified Petition and the proposed order by Petitioner. Petitioner seeks a permanent injunction to end the ongoing illegal activities of Mek Global Limited and Phoenixfin PTE Ltd., both doing business as KuCoin (hereinafter collectively referred to as "KuCoin"), which include engaging in the offer, sale and purchase of securities and commodities in the State of New York in violation of General Business Law ("GBL") § 352 *et seq*. (the "Martin Act") and Executive Law ("Executive Law") § 63(12).

Petitioner submits this memorandum of law and the accompanying Affirmation of John Ruth ("Ruth Affirmation") dated March 8, 2023, with exhibits, in support of the Verified Petition, as well as the affidavits of OAG Senior Detective Brian Metz ("Metz Aff."), sworn to on March 8, 2023, and OAG Legal Assistant Edward Jaffe ("Jaffe Aff"), sworn to on March 3, 2023, filed herewith.

## PRELIMINARY STATEMENT

The Martin Act has governed the regulation of securities in New York state for over a century. Pet. ¶ 7. "The purpose of the [Martin Act] is to prevent all kinds of fraud in connection with the sale of securities … and to defeat all unsubstantial and visionary schemes in relation thereto whereby the public is fraudulently exploited." *People v. Federated Radio Corp.*, 244 N.Y. 33, 38 (1926). *Id.* In keeping with that mission, the Martin Act requires registration of brokers and dealers to facilitate OAG's regulation and investigation of industry participants and to allow investors to make informed decisions about "those [that] they are trusting with their money." *People v. Landes*, 84 N.Y.2d 655, 662 (1994).

Initially, the New York State Legislature created registration requirements to allow the "Attorney-General to investigate issues and promotions *before* and not merely after the pockets

of the public have been emptied." *Letter from Attorney General Albert Ottinger to Governor Alfred E. Smith*, (Apr. 1, 1925), Bill Jacket, L 1925 ch 239, at 6 (emphasis added). However, in 1959, the Legislature expanded the Martin Act to help "deal effectively with those few who operate in the fringe area and who…jeopardize the confidence" in the market or in those who act lawfully. *Governor Nelson A. Rockefeller on Registration of Securities Brokers, Dealers, and Salesmen*, April 22, 1959, 1959 McKinney's Sess. Laws of NY at 1767.   In 1984, the Legislature further expanded registration requirements to require registration of commodities brokers with the state. *Am. Memorandum for Governor by Attorney General Abrams*, at 1 (Attorney General's Legislative Program (No. 108-83)), Bill Jacket, L 1984 ch 810, at 60 .  The law was "specifically designed to impose a significant sanction on those individuals who seek to straddle the Federal and State regulations" by not registering.  In enacting the bill, the Legislature intended that demonstrating a violation would be "straightforward." *Id*.  "Proof of engaging in the sale of the commodities and being unregistered would be a relatively simple task."  *Id* at 58.

KuCoin, a cryptocurrency trading platform, violated the Martin Act in at least three ways. First, KuCoin sold, offered to sell, purchased and offered to purchase cryptocurrencies that are commodities and securities without being registered with OAG[1] as a commodity broker-dealer or a securities broker or dealer in violation of New York law.  Verified Petition ("Pet.") ¶¶ 5, 30-34; Metz Aff. ¶¶ 57-60.  The cryptocurrencies KuCoin sold to New Yorkers include Ether ("ETH"), LUNA, and TerraUSD ("UST") (collectively the "Tokens").

Second, KuCoin issued and sold "KuCoin Earn," a security in which KuCoin pooled investors' cryptocurrencies  to generate income for both itself and investors.  KuCoin issued and sold this product to New Yorkers without registering as a securities broker or dealer.

---

[1] OAG is also known as the New York State Department of Law ("DOL").

Finally, KuCoin wrongfully represented itself as an "exchange" without appropriate registration or designation in violation of New York law. Pet. ¶ 79; Metz Aff. ¶ 14.

By operating in this manner, KuCoin engaged in repeated and persistent illegality in violation of the New York Executive Law ("Executive Law") § 63(12) and the New York General Business Law ("GBL") ("the Martin Act") §§ 352-c(3), 359-e (2), 359-e(3) and 359-e(14)(b, j, and l).

Petitioner seeks a summary grant of the relief sought in the Verified Petition, as authorized by Executive Law § 63(12) and governed by CPLR Article 4, including a permanent injunction, an order directing KuCoin to implement geo-blocking based on IP addresses and GPS location to prevent access to KuCoin's mobile app, website, and services from New York, an accounting, restitution, disgorgement, and costs against KuCoin.

## STATEMENT OF FACTS

### I.      The KuCoin Platform

KuCoin is a cryptocurrency trading platform founded in September 2017, and headquartered in the Republic of Seychelles. Pet. ¶ 16; Metz Aff. ¶ 4.  It is owned and operated by Mek Global Limited, which is based in the Republic of Seychelles, and PhoenixFin PTE Ltd., which is based in Singapore. Pet. ¶ 16; Metz Aff. ¶ 4.

KuCoin operates through www.kucoin.com ("KuCoin Website") and mobile applications offered in application marketplaces available on most mobile phones.  Pet. ¶ 20; Metz Aff. ¶ 2. On its website, KuCoin boasts a user base of over 20 million investors across over 200 countries. Pet. ¶ 20; Metz Aff. ¶ 14. KuCoin markets itself as "the People's Exchange" and the "Top 1 Altcoin Exchange" while making its website and services available to investors in New York to purchase and sell cryptocurrency.  Pet. ¶ 21; Metz Aff. ¶ 14.

To begin trading on KuCoin, investors must open a KuCoin account by providing a phone number, creating a password, and agreeing to its terms of service.  Pet. ¶ 24; Metz Aff. ¶

24 .  Once the account is created, KuCoin provides the investor with links instructing the users

on how to purchase cryptocurrencies.  Pet. ¶ 24; Metz Aff. ¶ 25.  Investors can then place orders

to purchase and sell.  Pet. ¶ 30-33; Metz Aff. ¶ 57-60.

## II.  KuCoin Sold and Purchased Commodities and Securities Without Registration

KuCoin offers for sale, sells, offers for purchase, and purchases, multiple

cryptocurrencies to and from New York, including ETH, LUNA, and UST.  Pet. ¶ 30-33; Metz

Aff. ¶ 57-60.

KuCoin has not filed a registration statement with OAG to operate as a commodity

broker-dealer and is not exempted from such registration.  Pet. ¶ 65; Jaffe Aff. ¶ 7.  KuCoin has

also not filed a registration statement with OAG to operate as a securities broker or dealer.  Pet. ¶

75; Jaffe Aff. ¶ 7.

### A.  ETH

KuCoin offered, sold and purchased a cryptocurrency called ETH on its platform.  ETH

is the native cryptocurrency on the Ethereum blockchain created by Vitalik Buterin and several

others.[2]  Pet. ¶ 38; Metz Aff. ¶ 29.  A blockchain is a distributed ledger that maintains a system

of payments and receipts for cryptocurrency transactions.  ETH has grown to become one of the

largest cryptocurrencies in the world, with a market capitalization of over $170 billion.  Pet. ¶

38; Metz Aff. ¶ 30 .  Its price has increased astronomically from its initial price of $0.31 to a

peak of $4,815 in November 2021 and is currently valued at roughly $1,400. Pet. ¶ 38; Metz Aff.

¶ 30 .

---

[2] Ether or ETH is a cryptocurrency, and Ethereum is the name of the blockchain network. The two are often used interchangeably, but the difference is that ETH is the primary coin used on the network, whereas the Ethereum blockchain network is used as the foundational software for many different types of cryptocurrencies, smart contracts and applications.

### 1.   The Initial Coin Offering

ETH's development and management is largely driven by a small number of developers who hold positions in ETH and stand to profit from the growth of the network and the related appreciation of ETH.  Pet. ¶ 39; Metz Aff. ¶¶ 43-47.  In 2014, some of those developers founded the Ethereum Foundation. Pet. ¶ 39; Metz Aff. ¶ 39.  The Ethereum Foundation describes itself as a non-profit that "supports the Ethereum Ecosystem" through its work to "fund protocol development, grow the ecosystem, and advocate for Ethereum."  Pet. ¶ 39; Metz Aff. ¶ 38.

Shortly after the formation of the Ethereum Foundation, an initial coin offering ("ICO") was held in which ETH was sold to fund the creation of Ethereum.  Pet. ¶ 40; Metz Aff. ¶¶ 33-34.  The ETH ICO raised funds to support the development of the Ethereum blockchain, directly provided developers with funding.  Pet. ¶ 40; Metz Aff. ¶ 35.  The ICO was governed by documents including the ETH Genesis Sale Terms and Conditions and the Proposed Use of Revenue, collectively the "ICO Documents," which described the sale as a means of promoting the development of the Ethereum blockchain by paying expenses incurred by developers, paying for legal contingencies, research, and further development.  Pet. ¶ 40; Metz Aff. ¶¶ 33-34.  The Ethereum Foundation and Buterin received a portion of the funding raised in ETH's ICO.  Pet. ¶ 40; Metz Aff. ¶ 35.  Buterin and the Ethereum Foundation also received significant quantities of ETH in the ICO and are believed to retain significant positions of that ETH today.  Pet. ¶ 40; Metz Aff. ¶¶ 35-37, 41.

### 2.   Transition to Staking

Buterin and the Ethereum Foundation retain significant influence over Ethereum and are often a driving force behind major initiatives on the Ethereum blockchain that impact the functionality and price of ETH.  Pet. ¶ 41; Metz Aff. ¶ 43.  Most relevant here, Buterin and the Ethereum Foundation played key roles in facilitating the recent fundamental shift of the

transaction verification method from proof-of-work to proof-of-stake.  Pet. ¶ 41; Metz Aff. ¶¶ 43-47.  Indeed, one developer who worked on creating the software necessary for the transition stated that his team was "granted permission by the Ethereum Foundation" to work on the shift to proof-of-stake.  Pet. ¶ 41; Metz Aff. ¶ 47.

Transactions can only be entered on the blockchain once they are verified or validated. Under proof-of-work, computers on the Ethereum network competed to answer a mathematical puzzle in order to verify transactions on the blockchain and receive in-kind digital asset rewards. Under proof-of-stake, however, validators pledge or "stake" their holdings in ETH and are randomly chosen to verify transactions on the blockchain and receive an in-kind digital asset reward.  By shifting to proof-of-stake, ETH no longer relies upon competition between computers but instead now relies on a pooling method that incentivizes users to own and stake ETH.  The shift to proof-of-stake significantly impacted the core functionality and incentives for owning ETH because ETH holders can now profit merely by participating in staking. Pet. ¶ 42; Metz Aff. ¶ 47.

### 3.   ETH Is Promoted as an Investment

The developers of ETH promoted it as an investment that was contingent on the growth of the Ethereum network.  For instance, the Ethereum Foundation notes on its website that many ETH users "see it as an investment, similar to Bitcoin and other cryptocurrencies."  Pet. ¶ 43; Metz Aff. ¶ 31.  In addition, the ICO Documents included representations that ETH production would dramatically slow over time, resulting in ETH becoming increasingly scarce and, thus, more valuable.  Pet. ¶ 43; Metz Aff. ¶ 31.  Indeed, the Ethereum Foundation claims on its website that users of Ethereum "see it as a digital store of value because the creation of new ETH slows down over time."  Pet. ¶ 43; Metz Aff. ¶ 31.  Since transitioning to the proof-of-stake

consensus, possession of ETH translates directly to profit potential by earning staking rewards. Pet. ¶ 43; Metz Aff. ¶ 42.

### B.  LUNA and UST

LUNA and its sister token, UST, are virtual assets created by Terraform Labs as an "algorithmic stablecoin" project which involved two components: LUNA, a token with a free-floating price that would rise and fall with demand, and UST, which was intended to keep a stable price equal to one U.S. dollar.  Pet. ¶ 44; Metz Aff. ¶ 51.  LUNA was designed to be convertible to UST, and a dollar's worth of LUNA could be converted into one UST.  *Id.*

### 1.  LUNA and UST Were Promoted as Investments

From its inception, the LUNA token was promoted as an investment.  Terraform Labs' April 2019 whitepaper regarding the LUNA and UST project explained that LUNA and UST were "growth-driven" and discussed creating applications to create demand and use for UST. Pet. ¶ 45; Metz Aff. ¶ 52.  Terraform Labs founder, Do Kwon, frequently marketed LUNA as having growth potential and value as an investment.  For instance, on March 22, 2021, Do Kwon described LUNA and UST's protocol on Twitter as being "designed to… accrue value to the moon."  Pet. ¶ 45; Metz Aff. ¶ 53.  Essentially, LUNA's price was tied proportionately to the amount UST was used.  Kwon explained:

> A bet on the moon is very simple: it goes up in value (inc. scarcity) the more Terra money is used[,] it goes down in value (inc. dilution) the less Terra money is used[.]  The moon's fate in the long run is tied to how widely the money gets used and transacted. . . . $Luna value is actionable, it grows as the ecosystem grows.

> Pet. ¶ 45; Metz Aff. ¶ 53.

Do Kwon also used Twitter to promote the ability of investors in LUNA to earn double-digit returns in UST by staking their assets to receive profits.  Pet. ¶ 46; Metz Aff. ¶ 53.  On the LUNA and UST network, investors staked LUNA and rewards were paid in UST. Pet. ¶ 46;

Metz Aff. ¶ 53.

### 2.   Terraform Labs Drove the Growth of LUNA and UST and Stood to Profit from that Growth

Terraform Labs was primarily responsible for driving the growth of LUNA and UST. They did so by creating interconnected platforms and applications that promised interest rates as high as 20% in exchange for deposits of UST on the lending platform created by Terraform Labs.  Pet. ¶ 47; Metz Aff. ¶ 54.  The allure of 20% interest rates – levels well above those available in a savings account or certificate of deposit – drove significant numbers of investors to deposit UST onto Terraform Lab's lending platform.  Pet. ¶ 47; Metz Aff. ¶ 54.  Importantly, however, Terraform Labs subsidized those 20% yields, meaning the yields were not generated solely by the interest earned on the deposit but were bankrolled by Terraform Labs itself.  Pet. ¶ 47; Metz Aff. ¶ 54.  Terraform Labs told venture capital firms in private offering documents that its role in developing LUNA and UST was crucial to the projects' success.  In disclosure documents, Terraform Labs warned that its inability "to establish the Project or Tokens' utility" could render the project no longer viable.  Pet. ¶ 47; Metz Aff. ¶ 56.

Additionally, Terraform Labs used sales of LUNA to raise funds for its operations and provide incentives for employees.  Do Kwon publicly announced that Terraform Labs committed to "unlock at most 3 million LUNA per month for all operating costs…" and that it would cover expenditures in "a new funding initiate for critical infrastructure improvements and core technologies to supplement the accelerating growth of the Terra ecosystem" and "all other [Terraform Labs] operating costs such as employee token distribution."  Pet. ¶ 48; Metz Aff. ¶

55.  This funding structure illustrates Terraform Labs' dependence on the appreciation of value in LUNA in order to continue its day-to-day operations.

### C.  KuCoin Repeatedly Offered, Purchased, and Sold ETH, LUNA, and UST

OAG confirmed that KuCoin sold the Tokens in New York, as evidenced by their sales to OAG Senior Detective Brian Metz ("Detective Metz").  In his first transaction on the KuCoin platform on May 18, 2022, Detective Metz placed an order to sell ETH and to buy LUNA tokens on KuCoin. Pet. ¶ 30; Metz Aff. ¶ 57.KuCoin filled Metz's order. Metz Aff. ¶ 42. Detective Metz's second transaction on the same day was to place an order to purchase UST tokens and KuCoin filled that order as well.  Pet. ¶ 31; Metz Aff. ¶ 58.  Detective Metz then used those UST tokens to place an order to purchase LUNA tokens from KuCoin on the same day and KuCoin filled that order as well.  Pet. ¶ 31; Metz Aff. ¶ 59.  KuCoin charged Detective Metz a fee of 0.1% for each transaction on each sale and each purchase.  Pet. ¶ 32; Metz Aff. ¶¶ 57-59.  Each of these orders was placed and executed while Detective Metz was physically present in New York and used a computer with a New York based IP address.  Pet. ¶ 28; Metz Aff. ¶ 19.  In addition, KuCoin's Website continues to be available to New Yorkers.  Pet. ¶ 60-61; Metz Aff. ¶ 68.

### III.   KuCoin Issued and Sold the "KuCoin Earn" Securities

KuCoin issued and sold a security which it called "KuCoin Earn."  KuCoin markets "KuCoin Earn" as a way for investors to "earn stable profits with professional asset management."  Pet. ¶ 50; Metz Aff. ¶ 62.  KuCoin encourages investors to use KuCoin Earn "to increase the value of their holdings" and promotes KuCoin Earn as a product that "allows users to earn passive income."  Pet. ¶ 50; Metz Aff. ¶ 62.

KuCoin Earn is comprised of a savings product and a staking product.  The savings

product pays users a certain amount of interest for depositing cryptocurrency into their KuCoin

Earn Savings account, which pools assets together and functions "like savings with a bank." Pet.

¶ 51; Metz Aff. ¶ 63.  The staking product offers to pool users' assets together and generate

staking rewards from those assets.  Pet. ¶ 51; Metz Aff. ¶ 63.  KuCoin charges investors who use

KuCoin Earn a fee which it describes as "necessary expenses" in its user agreement.  Pet. ¶ 51;

Metz Aff. ¶ 65.

On February 1, 2023, Detective Metz deposited 15.762022 Tethers ("USDT"), a form of

cryptocurrency, in KuCoin Earn and was shown a 3.8% "Reference APY" for depositing the

USDT.  Pet. ¶ 33; Metz Aff. ¶ 66.  Detective Metz placed the order for the transaction while he

was physically present in New York and using a computer with a New York based IP address.

Pet. ¶ 28; Metz Aff. ¶ 67.

### IV.     KuCoin Represented Itself as an Exchange

The KuCoin Website describes KuCoin as "the People's Exchange" and the "Top 1

Altcoin Exchange," and makes claims regarding the safety and security of the "exchange."  Pet. ¶

21; Metz Aff. ¶ 14.  However, KuCoin is neither registered with the United States Securities and

Exchange Commission ("SEC") as a national securities exchange, nor has it been designated as a

contract market by the Commodities Futures Trading Commission ("CFTC") as required by

GBL § 352-c(3).  Pet. ¶ 80; Jaffe Aff. ¶¶ 6, 8.

### V.     KuCoin Failed to Comply with an OAG Subpoena

As part of its investigation into the KuCoin cryptocurrency trading platform, OAG served

a subpoena *ad testificandum* on each of the Respondents on January 10, 2023 to appear on

January 23, 2023 and provide testimony concerning "the crypto-asset securities and commodities

trading activities of your web-based digital asset trading platform, KuCoin, within New York

State or any matter which the Attorney General deems pertinent thereto."  Ruth Aff. ¶ 3.

The subpoena served on each of the Respondents pursuant to N.Y. Gen. Bus. Law § 352-b states in pertinent part:

> TAKE FURTHER NOTICE that Your disobedience of this Subpoena, by failing to appear and attend and testify on the date, time and place stated above or on any agreed upon adjourned date or time, may subject You to prosecution for a misdemeanor or penalties and other lawful punishment under General Business Law § 352(4) and § 2308 of the New York Civil Practice Law and Rules, and/or other statutes.

Pet. ¶ 82.

In addition to serving the subpoenas, OAG also emailed Respondents the subpoena at email addresses listed for law enforcement requests and legal inquiries and received no response. Pet ¶ 83.  On January 23, 2023, Respondents failed to appear before OAG on behalf of KuCoin. Pet ¶ 84; Ruth Aff. ¶ 5.

## VI.    KuCoin Has Been Subject to Regulatory Action Internationally

At least three foreign jurisdictions have taken adverse regulatory action against KuCoin. In February 2021, the Financial Services Authority of the Republic of Seychelles identified Mek Global Limited as operating a cryptocurrency trading platform under the name KuCoin and through the KuCoin Website without proper licensure and, as a result, removed the company from the Seychelles corporate registry.  Pet. ¶ 17; Metz Aff. ¶ 6.

The following year, in June 2022, the Ontario Securities Commission obtained a multimillion-dollar judgment in a proceeding against Mek Global Limited and Phoenixfin PTE Ltd. finding that KuCoin operated in Ontario without properly registering.  Pet. ¶ 18; Metz Aff. ¶ 10.

Finally, in December 2022, the Dutch Central Bank issued a warning to investors regarding Mek Global Limited doing business as KuCoin. Pet. ¶ 19; Metz Aff. ¶ 11.  The warning concerned KuCoin offering services without registration, including exchanging virtual

currencies and fiat currencies and illegally offering custodian wallets. Pet. ¶ 19; Metz Aff. ¶ 11.

## ARGUMENT

**I.     Executive Law § 63(12) Authorizes the Attorney General to Obtain Expedited, Comprehensive Relief**

Executive Law § 63(12) empowers the Attorney General to bring a special proceeding. A special proceeding is "plenary as an action, culminating in a judgment, but is brought on with the ease, speed and economy of a mere motion." David D. Siegel, *N.Y. Practice* § 547 (6th ed. 2018).  The legislative purpose for allowing a special proceeding under § 63(12) is to give OAG expeditious means to enjoin fraudulent or illegal activity to further the public interest. *See, e.g., People v. Apple Health and Sports Clubs,* 206 A.D.2d 266, 267 (1st Dep't 1994), *appeal denied*, 84 N.Y.2d 1004 (1994) (citing *People v. B.C. Assocs*., Inc., 194 N.Y.S.2d 353, 356-58 (Sup. Ct. N.Y. Cnty. 1959)) (stating that Executive Law § 63(12) is "intended as an expeditious means for the Attorney-General to prevent further injury . . .").  "Under N.Y. Executive Law § 63, the Attorney General may utilize N.Y.C.P.L.R. 409(b) to seek injunctive relief against any business engaged in repeated fraudulent or illegal conduct in the transaction of business."  *People v. Applied Card Sys., Inc*., 27 A.D. 3d 104, 106 (3d Dep't 2005).

A special proceeding goes right to the merits.  The Court is required to make a summary determination upon all the pleadings, papers, and admissions to the extent that no triable issues of fact are raised.  CPLR § 409.  To the extent that triable issues of fact are raised, they must be tried "forthwith." CPLR § 410.  Importantly, "the [R]espondents have the burden of establishing a triable issue of fact."  *People v. P.U. Travel, Inc*., 2003 N.Y. Misc. LEXIS 2010, at *12 (Sup. Ct. N.Y. Cnty. June 19, 2003).

**II.     KuCoin Violated the Martin Act By Failing to Register**

KuCoin was engaged in the business of selling, offering to sell, purchasing, and offering to purchase commodities through commodity contracts and effecting transactions in securities for the accounts of others, within New York, while not being registered with OAG as a

commodity broker-dealer or securities broker or dealer, and illegally represented itself as an "exchange" without proper registration or designation, all in violation of the Martin Act.

The Martin Act requires registration to facilitate OAG's regulation and investigation of broker-dealers and to allow investors to make informed decisions about the people they choose to trust with their investments. *See Landes*, 84 N.Y.2d at 662.

The failure to register is a fraudulent practice under the Martin Act. GBL § 359-e (14)(l). *See People v. Credit Suisse Sec. (USA) LLC*, 31 N.Y.3d 622, 631 (2018) (highlighting that the definition of fraudulent practices was expanded to include certain registration requirements.) Additionally, the Martin Act makes any act or practice prohibited under GBL §352-c a misdemeanor criminal offense. GBL §352-c(4). *Id*.

### A. KuCoin Violated the Martin Act By Failing to Register as a Commodity Broker-Dealer

The Tokens are commodities under the Martin Act. In 2020, the First Department squarely held that a virtual currency was a "commodity" within the meaning of the Martin Act:

> [T]he Martin Act's definition of commodities as including "any foreign currency, any other good, article, or material" (GBL 359–e[14] ) is broad enough to encompass [the virtual currency] *tether*. Indeed, federal courts and the Commodities Futures Trading Commission have found that virtual currencies are commodities under the Commodities Exchange Act, which defines the term more narrowly than does the Martin Act . . . .

*Matter of James v. iFinex, et al.,* 127 N.Y.S.3d 456, 461 (1st Dept. 2020) (emphasis in original); *see also People v. Coinseed, Inc., et al*, No. 450366/2021, 2021 WL 4148794 at 1 (Sup. Ct. N.Y Cnty. Sept. 9, 2021) (permanently enjoining under the Martin Act defendants who sold commodities and/or securities while unregistered).

Federal law is in accord. *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y. 2018) (virtual currencies such as bitcoin "fall well-within the common definition of 'commodity' as well as the CEA's definition of 'commodities'…); *Lagemann v. Spence*, 18 Civ. 12218 (GBD)

(RWL), 2020 U.S. Dist. LEXIS 88066, at *32-33 (S.D.N.Y. May 18, 2020) ("courts in this District have classified cryptocurrency as a 'commodity'."), *citing SEC. v. Telegram Grp. Inc.*, No. 19 Civ. 9439 (PKC), 2020 U.S. Dist. LEXIS 53846, at *3-4 (S.D.N.Y. March 24, 2020) ("Cryptocurrencies . . . are a lawful means of storing or transferring value and may fluctuate in value as any commodity would"); *CFTC v. Gelfman Blueprint, Inc.*, No. 17 Civ. 07181 (PKC), 2018 U.S. Dist. LEXIS 207379, at *13-14 (S.D.N.Y. Oct. 2, 2018) ("Virtual currencies such as Bitcoin are encompassed in the definition of 'commodity' under Section 1a(9) of the Act"…); *Matter of Coinflip, Inc.,* 2015 WL 5535736, *2, 2015 CFTC LEXIS 20 (Sept. 17, 2015, CFTC Docket No. 15–29) ("The definition of a "commodity" is broad.  Bitcoin and other virtual currencies are encompassed in the definition and properly defined as commodities.") (citations omitted).

Under both state and federal authority, ETH, LUNA, and UST are commodities.  In fact, because the Martin Act's definition of commodity is broader than the federal definition, anything held to be a commodity under federal law would most certainly satisfy the definition of commodity under the Martin Act.

### 1. KuCoin Engaged in Business as a Commodity Broker-Dealer in New York

Section 359-e (14) of the Martin Act provides, in relevant part, that those engaging in the business of buying and selling commodities on behalf of clients in New York must register with OAG.  Specifically, Section 359-e(14)(b) provides, in relevant part:

> Any person acting as a commodity broker-dealer, commodity salesperson or commodity investment advisor and any person who manages or supervises any such broker-dealer, salesperson or investment advisor shall file a registration statement with the attorney general as a commodity broker-dealer, commodity salesperson, or commodity investment advisor relating to the activity actually engaged in.
> GBL § 359-e(14)(b)

Subsection (a)(iii) defines a "commodity broker-dealer" as follows:

> "Commodity broker-dealer" means any person engaged in the business of selling or offering to sell commodities through commodity contracts to the public within or from the state of New York.

> GBL § 359-e(14)(a)(iii).

A "commodity contract" is further defined in subsection a(ii) as:

> any account, agreement or contract for the purchase or sale of, or any option or right to purchase or sell, primarily for speculation or investment purposes and not for use or consumption by the offeree or purchaser, one or more commodities, whether for immediate or subsequent delivery or for storage and whether or not delivery is intended by the parties . . .

> GBL § 359-e(14)(a)(ii).

KuCoin is required to register as a commodity broker-dealer because it was engaged in the business of selling or offering to sell commodities through accounts or agreements that were primarily for speculation or investment purposes to the public in the State of New York. Pet. ¶¶ 28-31; Metz Aff. ¶¶ 57-59. The commodities KuCoin sold were for speculation or investment purposes. First, the Tokens were promoted as investments on the KuCoin website. Pet. ¶¶ 22; Metz Aff. ¶¶ 20, 49. Second, KuCoin described users of its website as "investors." Pet. ¶¶ 21; Metz Aff. ¶ 14 (*see* Exhibit 1.1 to Metz Aff.). Third, the Tokens were eligible for staking. Pet. ¶¶ 26, 42-43, 46; Metz Aff ¶¶ 42, 53, (*see* Exhibit 1.6). In addition, the Tokens were sold through accounts or agreements for which KuCoin collected a fee. Pet. ¶ 32; Metz Aff. ¶¶ 57-59. Accordingly, KuCoin was a commodity broker-dealer under New York law and was therefore required to file a registration statement with OAG prior to engaging in such conduct.

### 2.   KuCoin was not Registered as a Commodity Broker-Dealer

Subject to certain exemptions which do not apply to Respondents, subdivision 14(b) of

GBL § 359-e and Title 13, N.Y.C.R.R. § 13.2 require that any commodity broker-dealer "shall

file" with OAG a "registration statement."  GBL § 359-e (14)(b); 13 N.Y.C.R.R. § 13.2.

Respondents are not registered as commodity broker-dealers as required under the Martin

Act. Pet. ¶ 53; Jaffe Aff ¶ 7. Respondents do not fall within any exemption available under GBL

§ 359-e or the regulations promulgated thereunder.  Pet. ¶ 53.  Nonetheless, KuCoin failed to file

a registration statement with OAG in violation of the Martin Act.

### B.  KuCoin Violated the Martin Act by Failing to Register as a Securities Broker or Dealer

Similar to its requirements for commodity broker-dealers, the Martin Act sets forth the

following regarding securities brokers and dealers:

> It shall be unlawful for any dealer, broker or salesman to sell or offer
> for sale to or purchase or offer to purchase from the public within or
> from this state, any securities issued or to be issued, unless and until
> such dealer, broker, or salesman shall have filed with the department
> of law a registration statement as provided herein.

GBL § 359-e (3).

Under the Martin Act, a "dealer" is "any person, firm, association, or corporation

engaged in the business of buying and selling securities from or to the public within or from

this state for his or its own account, through a broker or otherwise…" and includes issuers, i.e.,

a person or firm "selling or offering for sale ...securities issued by it."  GBL § 359-e(1)(a).  A

"broker" under the Martin Act is  "any person, firm, association, or corporation, other than a

dealer, engaged in the business of effecting transactions in securities for the account of others

within or from this state…."  GBL § 359-e(1)(b).

Accordingly, under New York law, to engage in the business of offering, selling, and

purchasing securities for the accounts of others or issuing securities to the public, a dealer or

broker must file a registration statement with OAG.

     **1.**  **KuCoin Engaged in the Business of Effecting Transactions in Securities and Issued its Own Securities Under the *Waldstein* Test**

The Tokens KuCoin sold and purchased to and from New York are securities under New York law.[3]  In *In re Waldstein*, 160 Misc. 763 (Sup. Ct, Albany Cnty. 1936), adopted by the New York Court of Appeals in *All Seasons Resorts v. Abrams*, 68 NY 2d 81 (1986), the Court held: "In general, any form of instrument used for the purpose of financing and promoting enterprises, and which is designed for investment, is a security…"  *Waldstein*, 160 Misc. at 767.  ETH, LUNA, UST, and KuCoin Earn are each securities under *Waldstein*.

ETH satisfies the *Waldstein* test.  The ICO was used to raise funds to develop the Ethereum network, as set forth in the ICO Documents.  Pet. ¶ 40; Metz Aff. ¶¶ 33-35.  And Vitalik Buterin and the Ethereum Foundation retained large positions of ETH that they continue to use to fund ETH's development.  Pet. ¶ 40; Metz Aff. ¶¶ 35-37, 41.  ETH was also designed as an investment.  It continues to be referred to as an "investment" on the Ethereum Foundation's website.  Pet. ¶ 43; Metz Aff. ¶¶ 31, 34, 41.  And ETH is used to generate staking rewards for investors.  Pet. ¶ 43; Metz Aff. ¶ 42.  Furthermore, ETH was used to promote the Ethereum enterprise because ETH is needed to process any transactions on the Ethereum network.

Similarly, LUNA and UST satisfy the *Waldstein* test.  Terraform Labs sold LUNA to fund operations, pay employees, maintain the network, and used UST to subsidize its lending platform.  Pet. ¶¶ 47-48; Metz Aff. ¶¶ 54-56.  LUNA and UST were also promoted as investments that would grow in value as the network grew.  Pet. ¶ 45; Metz Aff. ¶¶  52-53.

---

[3] An investment product can be both a commodity and a security. *See People v. Thomas*, 134 Misc. 2d 649, 653 (Sup. Ct. N.Y. Cnty. 1986) (finding that a transaction involving art works sold or offered for sale was an investment contract security and that the same transaction involved commodities and commodity contracts as those terms are defined in GBL § 359-e(14)(a)(i) and (ii)).

Individuals who staked LUNA could also passively generate returns in UST through their investment.  *See* Pet. ¶ 46; Metz Aff. ¶ 53.

Finally, KuCoin Earn satisfies the *Waldstein* test.  The profits generated by KuCoin Earn are divided so that KuCoin takes its fee for the management and operation of KuCoin Earn and thereby receives financing for its enterprise from KuCoin Earn.  Pet. ¶ 51; Metz Aff. ¶ 65. KuCoin Earn is also used to promote the KuCoin enterprise insofar as it is designed to encourage investors to purchase cryptocurrency from, and hold it with, KuCoin.  Pet. ¶¶ 50-51; Metz Aff. ¶¶ 62-63.  In return, KuCoin promised investors they could "earn stable profits with professional asset management."  Pet. ¶ 50; Metz Aff. ¶ 62.  By making such claims, KuCoin actively promoted KuCoin Earn as an investment product that would allow investors to generate passive income.  Pet. ¶ 50; Metz Aff. ¶ 62.

Each of the Tokens and KuCoin Earn were used for the purpose of financing and promoting enterprises and were also designed for investment and therefore, each qualifies as a security under *Waldstein*.

### 2. KuCoin Engaged in the Business of Effecting Transactions in Securities Under the *Howey* Test by Selling the Tokens

The Court of Appeals has also adopted the federal test for determining whether a financial product is a security.  In *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)*,* the Supreme Court broadly equated securities with investment contracts, and held that "an investment contract … means a contract, transaction, or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits solely from the efforts of the promoter or a third party[.]"  *Id*. at 298-299.  The New York Court of Appeals adopted the *Howey* test and has held that the promoter's efforts need not be the sole cause of profits, and that it is sufficient if the promoter's efforts are "the undeniably significant ones … which effect the failure or success of the enterprise."  *People v. First Meridian Planning Corp.,* 86 NY 2d 608 (1995).  The *Howey*

test is similar to the analysis under *Waldstein*, insofar as it focuses on the fact that the instruments were used to finance and promote an enterprise and are designed for investment.

The first element of the *Howey* test, the investment of money, is satisfied here because members of the public invest money in order to buy ETH and purchase LUNA and UST.  *See* Pet. ¶¶ 23, 29-31, 33; Metz Aff. ¶¶ 15, 58-60.  Typically, investors must provide consideration, which may be in the form of cash or other cryptocurrencies, in order to acquire the Tokens.

The second element of the *Howey* test is that there must be a common enterprise.  Here, investors in ETH, LUNA, and UST are in a common enterprise with each cryptocurrency's management team because a portion of available tokens was reserved for the tokens' respective founders, management teams, and developers, thereby tying the fortunes of the token holder to the fortunes of management.  *See* Pet. ¶¶ 40, 48; Metz Aff. ¶¶ 33-34, 54, 55.  Developers of ETH, such as Vitalik Buterin and the Ethereum Foundation, purchased ETH tokens in the ETH ICO and are believed to retain large stakes in those tokens today.  Pet. ¶ 40; Metz Aff. ¶¶ 35-37, 41. The funds earned from the ETH ICO were claimed to be used to pay the expenses incurred by developers, legal contingencies, research, and further development of the Ethereum blockchain.  Pet. ¶ 40; Metz Aff. ¶¶ 48, 33-34.  Similarly, Terraform Labs "unlocked millions of LUNA per month for all operating costs such as employee token distribution."  Pet. ¶¶ 48; Metz Aff. ¶¶ 55. Terraform Labs also used UST to subsidize their lending platform, which drove the growth of LUNA and UST, thereby creating a common enterprise.  Pet. ¶ 47; Metz Aff. ¶ 54.

The third and final element of the *Howey* test is that the investor is led to expect profits from the efforts of a third party. ETH, LUNA, and UST's management teams promoted their respective cryptocurrencies as profit opportunities that were contingent on the growth of their respective networks, which would occur in substantial part because of work performed by its founders, developers, and managers.  *See* Pet. ¶¶ 40-43, 45, 47; Metz Aff. ¶¶ 33-35, 53-56.  The

Ethereum website referred to ETH as a "store of value" and an "investment." Pet. ¶ 43; Metz Aff. ¶¶ 31, 34. Furthermore, the founders, developers, and management drove the transition to a proof-of-stake protocol, which presented users with the opportunity to generate profits through holding ETH and staking. Pet. ¶ 41; Metz Aff. ¶¶ 42-47.

With respect to LUNA and UST, the growth and adoption of LUNA and UST was contingent upon Terraform Labs' development of platforms where UST could be used. Pet. ¶¶ 45-47; Metz Aff. ¶¶ 53-56. LUNA and UST founders, developers, and managers developed Terraform Labs' lending platform, which propelled the use of UST and increased demand for LUNA. *See* Pet. ¶ 47; Metz Aff. ¶ 54. LUNA and UST's creator, Do Kwon, also explicitly promoted the ability to generate profits in UST through LUNA staking. Pet. Pet. ¶ 46; Metz Aff. ¶ 53.

For the foregoing reasons, the Tokens are securities because they each involve investments of money into a common enterprise with the expectation of profits due to the managerial efforts of the Tokens' respective founders, developers, and management teams.

### 3. The *Howey* Test is Applicable to the Tokens as Illustrated by Recent Federal Authority

A recent federal court decision in *SEC v. LBRY*, *Inc.*, No.1:21-cv-00260-PB (D.N.H. Nov. 7, 2022) is instructive. In *LBRY, Inc*., the SEC filed a complaint charging LBRY, Inc. with conducting an unregistered offering and sale of securities. *Id.* at 1. The court in LBRY determined that when considering whether a digital asset is a security under *Howey*, the primary issue in dispute is whether the issuer of the token led investors to have "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Id*. at 8. In *LBRY*, the court held that statements characterizing the purchase of the token as an investment with growth potential and a business model that intertwined the fate of the developers, and the success of the project weighed in favor of finding that the token was, in fact, a security. *Id*. at 9-

17.

The analysis in *LBRY* applies to ETH, LUNA, and UST.  Just as the token in *LBRY* was used to finance and promote its network, the ETH, LUNA, and UST tokens were used to finance and promote their respective networks' enterprises and were also promoted as profit accruing investments.  *See* Pet. ¶¶ 40-43, 45, 47; Metz Aff. ¶¶ 33-35, 53-56.

Accordingly, the Tokens are each a security under *Howey* (and *Waldstein*) and consistent with recent authority in *LBRY*.  Therefore, KuCoin was required to register prior to offering, selling, or purchasing the Tokens within New York.

### 4.   KuCoin Issued and Sold its Own Securities Under the *Howey* Test

KuCoin Earn was also a security under *Howey*.  KuCoin Earn satisfies the first prong of the *Howey* test, an investment of money, as investors deposit their cryptocurrencies into the product with an expectation of profit, in this case, interest from the KuCoin Earn savings product or rewards from the KuCoin Earn staking product.  Pet. ¶¶ 50-51; Metz Aff. ¶¶ 62-63.

 KuCoin Earn also satisfies the second prong of *Howey*, a common enterprise, insofar as it pooled investor money to generate returns—interest for the savings product and staking rewards for the staking product.  Pet. ¶¶ 51-52; Metz Aff. ¶ 63.  KuCoin takes a fee for its operation of KuCoin Earn, and investors are dependent on KuCoin to generate returns.  Pet. ¶¶ 52; Metz Aff. ¶ 65.  Accordingly, investors and KuCoin itself were in a common enterprise.

KuCoin Earn meets the third prong of *Howey* because investors were led to believe that they would receive a certain amount of interest or rewards for contributing their assets to KuCoin Earn.  Pet. ¶¶ 50-52; Metz Aff. ¶¶ 62-63, 64.  The investors were not required to exert any effort on their own.  Pet. ¶¶ 50-52; Metz Aff. ¶¶ 62-63.  They would receive interest or rewards based

on the efforts of KuCoin in deploying their assets to generate returns.  Pet. ¶¶ 50-52; Metz Aff.

¶¶ 62-63.

### 5.   KuCoin was not a Registered Securities Broker or Dealer

KuCoin was required to register under New York law because ETH, LUNA, UST, and

KuCoin Earn are securities, when KuCoin offered, sold, purchased, or issued the Tokens and

KuCoin Earn to and from New York, KuCoin was engaged in the business of effecting

transactions in securities on behalf of others.  Jaffe Aff ¶ 7.  Accordingly, KuCoin violated the

Martin Act.

### III.   Respondents Violated the Exchange Provision of the Martin Act

Section 352-c (3) of the Martin Act makes it a violation of law to represent oneself as an

exchange.  Section 352-c(3) of the General Business Law provides, in full:

> It shall be illegal and prohibited for any person, partnership,
> corporation, company, trust or association, or any agent or employee
> thereof, engaged in the sale of any securities or commodities, as defined
> in section three hundred fifty-two of this article, within or from the state
> of New York to represent that they are an "exchange" or use the word
> "exchange," or any abbreviation or derivative thereof, in its name or
> assumed name unless it is registered with the Securities and Exchange
> Commission as a national securities exchange, pursuant to section six
> of the Securities and Exchange Act of 1934, or unless it has been
> designated as a contract market by the Commodity Futures Trading
> Commission, pursuant to section five of the Commodity Exchange Act.

KuCoin is not registered as a national securities exchange with the SEC and is not

designated as a contract market by the CFTC and is therefore not entitled to represent itself as an

exchange.  Jaffe Aff  ¶¶ 6, 8.  Yet, KuCoin has engaged in the sale of cryptocurrencies through

its website, where it purports to operate "the People's Exchange" and "the Top 1 Altcoin

Exchange." Pet. ¶ 21; Metz Aff. ¶ 14.  In addition to representing itself as an exchange,

KuCoin's website also discusses KuCoin's safety as an "exchange." Thus, by their conduct,

Respondents violated GBL § 352-c(3).

IV.    **KuCoin's Failure to Comply with OAG Subpoena is Prima Facie
       Proof of its Violations of the Martin Act**

The Martin Act grants OAG the authority to issue subpoenas to compel testimony on matters deemed relevant or material to a Martin Act investigation. Section 352(2) of the General Business Law provides in full:

> The attorney-general, his deputy or other officer designated by him is empowered to subpoena witnesses, compel their attendance, examine them under oath before him or a magistrate, a court of record or a judge or justice thereof and require the production of any books or papers which he deems relevant or material to the inquiry. Such power of subpoena and examination shall not abate or terminate by reason of any action or proceeding brought by the attorney-general under this article.

Section § 353 of the General Business Law provides in pertinent part that a refusal "to be examined . . . when duly ordered so to do by the officer . . . fully conducting an inquiry into the subject matter forming the basis of the application for . . . [an] injunction . . . shall be prima facie proof that [the named] defendant is or has been engaged in fraudulent practices as set forth in such application and a permanent injunction may issue from the supreme court without any further showing by the attorney-general." GBL § 353(1).

Here, KuCoin was compelled by subpoena to appear for an examination under oath on January 23, 2023 and failed to appear. Ruth Aff. ¶ 5.  Therefore, pursuant to GBL § 353(1), KuCoin's failure to appear is prima facie proof that KuCoin has engaged in the violations of law set forth in the OAG Verified Petition.  OAG requests that the Court award OAG the maximum monetary allowance under the statute.

V.    **KuCoin Engaged in Persistent Illegality in Violation of Executive Law
      § 63(12)**

Executive Law § 63(12) gives OAG the power to bring an action against any person or entity that engages in "repeated fraudulent or illegal acts" or "otherwise demonstrate[s] persistent fraud or illegality in the carrying on . . . or transaction of business."  There are thus two bases in the statute for an action, acts that are "fraudulent" and acts that are "illegal."  Here, Respondents

have engaged in acts that are illegal as they violate the Martin Act.

As to the "illegal" basis of Executive Law § 63(12), an "illegal act" under the statute includes any violation of a federal, state, or local law.  *See State v. Princess Prestige*, 42 N.Y.2d 104, 105 (1977); *People v. Empyre Inground Pools, Inc*., 227 A.D.2d 731, 732-733 (3d Dep't 1996).  With respect to illegalities, Executive Law § 63(12) empowers the Attorney General to enforce all New York state laws and regulations.  Indeed, "[a]ny conduct which violates State or Federal law or regulation is actionable under this provision." *People v. World Interactive Gaming Corp*., 714 N.Y.S.2d 844, 848 (Sup. Ct. N.Y. Cnty. 1999) (citation omitted); *Princess Prestige*, 42 N.Y.2d at 105; *Empyre Inground Pools, Inc.*, 227 A.D.2d at 732-733; *Freedom Disc. Corp. v. Korn*, 279 N.Y.S.2d 774, 775 (1st Dep't 1967) (affirming use of Executive Law § 63(12) to enforce violations of the Penal Law).

Specifically, KuCoin's violations of the Martin Act, GBL §§ 359-e and 352-c(3) constitute repeated illegalities redressable under Executive Law § 63(12). *See People v Allen*, 452378/2019, 2021 WL 394821 at *14 (Sup. Ct. N.Y. Cnty. Feb. 4, 2021) (finding the Defendants' repeated violations of the Martin Act to be violations of Executive Law § 63(12); *aff'd*, *People v. Allen* , 198 A.D. 3d 531 (1st Dept 2021)). The statute defines "repeated" to include "[any] separate and distinct fraudulent or illegal act [or conduct] which affect[s] more than one [person]."  *People v. 21st Cent. Leisure Spa Int'l, Ltd.*, 153 Misc. 2d 938, 944 (Sup. Ct. N.Y. Cnty. 1991).  "[P]ersistent" is defined as the "continuance or carrying on of any fraudulent or illegal act of conduct."  *Id.*

KuCoin engaged in the business of effecting transactions in commodities and securities for Detective Metz's New York based account on separate dates in May 2022 and again in February 2023.  Pet. ¶¶ 29-34; Metz Aff. ¶¶ 57-60, 66.  KuCoin conducted the commodity and security offers, sales and purchases while having failed to register as a commodity broker-dealer or as a securities broker or dealer with OAG, and therefore each commodity and security offer, sale and purchase is a separate violation of the Martin Act and separate "illegal acts" that were repeated in violation of Executive Law § 63(12).

Additionally, KuCoin's website and mobile applications remain active and accessible to members of the public within New York State. Metz Aff. ¶ 68.  And KuCoin continues to rely on its website to solicit offers for the sale and purchase of the Tokens by presenting price quotes and displaying content that suggests it is an "exchange."

KuCoin's violations of the Martin Act are a repeated and persistent illegality and, thus, a violation of Executive Law § 63(12).

## VI.    The Court Should Order a Permanent Injunction, an Accounting, and Direct KuCoin to Prevent Access to its Website and Mobile App to New Yorkers and Award Restitution, Disgorgement, and Costs

Courts have broad statutory and equitable authority to grant injunctive relief, an accounting, restitution, disgorgement, costs, and other relief. *See, e.g., Princess Prestige*, 42 N.Y.2d at 107-108; *Greenberg*, 27 N.Y.3d at 497-98.  In this case, KuCoin's repeated and persistent fraudulent and illegal acts warrant injunctive relief, restitution, disgorgement, damages, costs, an accounting, and an order to restrict access to KuCoin's website and mobile applications.  Pursuant to § 63(12), courts are empowered to grant wide-ranging equitable relief to redress KuCoin's illegalities.

### A.  The Court Should Order Permanent Injunctive Relief

Once it finds in a summary proceeding pursuant to § 63(12) that a respondent is liable, a court is expressly authorized to permanently enjoin the fraudulent and illegal conduct at issue. *See, e.g., Princess Prestige*, 42 N.Y.2d at 108. To ensure that Respondents end their misconduct, the Court can immediately exercise its authority to grant injunctive relief even if subsequent proceedings are needed to determine the scope of monetary relief. *See, e.g., Dell,* 21 Misc. 3d 1110, at *12 (ordering injunctive relief while granting OAG discovery to determine the identities of all consumers entitled to restitution and the amount of monetary relief).

OAG seeks a permanent injunction banning KuCoin from selling and buying securities and commodities to and from New Yorkers. Courts are authorized to impose permanent injunctive relief similar to that sought here—a complete ban on the underlying conduct that

gave rise to the illegal activity.  *See State v. Ford Motor Co.*, 74 N.Y.2d 495, 502 (1989);

*Princess Prestige*, 42 N.Y.2d at 107; *see, e.g., State v. Daro Chartours, Inc.*, 72 A.D.2d 872 (2d

Dep't 1979); *Empyre Inground Pools, Inc.*, 642 N.Y.S.2d at 346 (affirming decision to grant

"petitioner's application and permanently enjoined respondents from engaging in the home

improvement and door-to-door sales businesses in New York.")

      **B.**  **The Court Should Order Respondent to Provide an Accounting
of All Fees Received From New York Investors and Direct
KuCoin to Prevent Access to its Website, Mobile App, and
Services from the State of New York**

Courts may order accountings under Section 63(12) to facilitate the determination of

restitution and disgorgement.  *See, e.g., People v. Veleanu*, 89 A.D.3d 950, 950 (2d Dep't 2011)

(affirming judgment ordering accounting pursuant to § 63(12)); *People v. Sec. Elite Grp.*, No.

33068, 2019 WL 5191214, at *6 (Sup. Ct., N.Y. Cnty. 2019) *6 (Sup Ct, NY Cnty 2019)

("directing the rendering of an accounting to the Attorney General of the names and addresses

of each consumer who paid fees directly to [Respondent] and the amount of money received

from each such consumer").

Here, the accounting should set forth all the names, email addresses, dates of all

transactions, associated IP addresses, last log-in date and time, the value, and the amount of

money KuCoin has received from each New York account at any time from six years prior to the

date of this Verified Petition to present.  This is needed to assess the extent of KuCoin's breach

of New York State laws and determine the total amount of revenue KuCoin generated through its

fraudulent and deceptive business practices.

Additionally, the Court should issue an order directing KuCoin to implement geo-

blocking based on IP addresses and GPS location to prevent access to KuCoin's mobile app,

website, and services from New York.  KuCoin has not responded to OAG's subpoena. KuCoin

has demonstrated no effort to comply with New York law, while continuing to provide its

services to New Yorkers.  Indeed, KuCoin has been the subject of repeated regulatory action

internationally, and yet continues to flout its registration obligations.  In *Coinseed*, Justice

Borrok ordered that the website of a cryptocurrency platform engaged in fraud be turned over to a receiver so that the website could no longer be used as a tool to defraud New Yorkers. *See Coinseed, Inc.*, 2021 N.Y. Misc. LEXIS at \*3.  Here, the requested relief is more narrow and offers KuCoin the opportunity to maintain its business in the jurisdictions in which it is registered to do business.

### C.  The Court Should Order KuCoin to Pay Restitution and Disgorgement

In addition to injunctive relief, the Court should grant restitution, and order KuCoin to pay disgorgement. Restitution under § 63(12) is a "vehicle by which aggrieved consumers [can] recover the money which is due them without resorting to costly litigation." *State v. Ford Motor Co.*, 136 A.D.2d 154, 158 (3rd Dep't 1988). Courts' broad power to direct restitution under § 63(12) "should be liberally construed," *New York v. Maiorano*, 189 A.D.2d 766, 767 (2d Dep't 1993), and an application for restitution pursuant to § 63(12) is "addressed to the sound judicial discretion of the trial court," *Princess Prestige*, 42 N.Y.2d at 108.  Courts' power to award restitution includes the power to order not only monetary relief but also the "authority to order respondents to take affirmative action" that may be necessary to effect restitution.  *Id.*

The Court should order KuCoin, pursuant to § 63(12) and the Martin Act, to disgorge all revenue obtained from their fraudulent and illegal sales and purchases of securities and commodities to and from New Yorkers.  A court may order disgorgement under § 63(12), "an equitable remedy distinct from restitution," *People v. Applied Card Sys.*, 11 N.Y.3d 105, 125 (2008), in order to "deter wrongdoing by preventing the wrongdoer from retaining ill-gotten gains from fraudulent conduct," *People v. Ernst & Young, LLP*, 114 A.D.3d 569, 569 (1st Dep't 2014).  Similarly, a court may order disgorgement under the Martin Act. *See People ex rel. Schneiderman v. Greenberg* 27 N.Y.3d 490, 497(2016).

Penalties should be large enough to deter illegal, deceptive, fraudulent conduct but should not "be so disproportionate to the offenses as to be excessive."  *Id*.  Here, it is appropriate for Respondents to be disgorged of profit earned from all its illegal conduct in New York State.

## VII.    The Court Should Award OAG Costs

CPLR 8303(a)(6) provides that the court may award OAG "a sum not exceeding two thousand dollars against each defendant" in a special proceeding brought under Executive Law § 63(12). New York courts routinely grant OAG such costs. *See e.g.*, *Daro Chartours, Inc.*, 72 A.D.2d at 873; *21st Cent. Leisure Spa*, 153 Misc. 2d at 944-45; *Midland Equities of N.Y., Inc.*, 458 N.Y.S.2d at 130; *People v. Therapeutic Hypnosis*, 83 Misc. 2d 1068, 1071-72 (Sup. Ct. Albany Cnty. 1975).  Accordingly, this Court should award Petitioner $2,000 in costs imposed against each Respondent.

## CONCLUSION

For the above reasons, the Court should grant the relief requested/demanded in the Petition.  A Proposed Order is respectfully submitted for the Court's review and approval.

Dated:        New York, New York,            Respectfully submitted,
              March 9, 2023


                                            LETITIA JAMES,
                                            Attorney General of the State of New York
                                            *Attorney for Petitioner*
                                            28 Liberty Street
                                            New York, New York 10005


                                         By:_____
                                            John R. Ruth
                                            Assistant Attorney General
                                            Tel: 212-416-8513
                                            John.Ruth@ag.ny.gov

                                            Kenneth Haim
                                            Deputy Chief, Investor Protection Bureau

                                            Shamiso Maswoswe
                                            Chief, Investor Protection Bureau

                                            *Attorneys for Petitioner*
                                            *People of the State of New York*

**Word Count Certification Pursuant to NYCRR 202.8-b**

I, John R. Ruth, Esq., hereby certify that the word count of this document, as calculated by Microsoft Office, exclusive of the caption, table of contents, table of authorities, and signature block, is 9,146 words.


By: _____

John R. Ruth, Esq.